**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**EXELON WIND 1, LLC,** *et al.,*
                            **Plaintiffs,**

-vs-                                                    **Case No.  A-09-CA-917-SS**

**BARRY SMITHERMAN,** *et al.,*
                            **Defendants.**

_____

**O R D E R**

        BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Plaintiffs Exelon Wind 1, LLC, et al. (Exelon)'s[1] Motion for Summary Judgment [#71],

Intervenor Defendant Southwestern Public Service Company (Southwestern)'s Response and Cross-

Motion for Summary Judgment [#76], Intervenor Defendant Occidental Permian (Occidental)'s

Response [#77], Defendants Public Utility Commission of Texas Commissioners[2] (PUCT)'s

Response and Cross-Motion for Summary Judgment [#80], Exelon's Reply [#93], and

Southwestern's Reply [#98] in support of its Cross-Motion for Summary Judgment; Occidental's

Motion to Compel Discovery [#75], Exelon's Response [#92], and Occidental's Reply [#94];

Occidental's Objections, Response, and Motion to Strike Plaintiff's Purported Undisputed Summary

Judgment Facts [#96], Exelon's Response [#91] thereto; Occidental and Southwestern's Joint

_____

        [1]The Exelon plaintiffs were previously known as JD Wind 1, LLC through JD Wind 6, LLC.  Although there are in fact six Exelon plaintiffs—Exelon Wind 1, LLC, Exelon Wind 2, LLC, etc.—the Court will refer to them collectively as "Exelon," except where it is necessary to do otherwise.

        [2]Exelon has actually sued, in their offical capacities, Barry Smitherman, Chairman of PUCT, and Donna L. Nelson and Kenneth W. Anderson, Jr., PUCT Comissioners.  The Court will refer to Smitherman, Nelson, and Anderson collectively as PUCT throughout.

Motion to Compel Depositions [#104], Exelon's Response [#105] thereto, and Occidental and Southwestern's Reply [#106]; and Occidental's Motion for Summary Judgment [#109], and Exelon's Response [#110] thereto.  Having considered the documents, the file as whole, the arguments of counsel at a hearing, and the governing law, the Court now enters the following opinion and orders, granting summary judgment for Exelon.

## Background

This is an implementation challenge to PUCT's interpretation and implementation of the federal Public Utility Regulatory Policies Act of 1978 (PURPA) and the corresponding Federal Energy Regulatory Commission (FERC) regulations.  The Court begins by laying out the relevant statutes and regulations, before describing the history of this case.

## I.      The Regulatory Landscape

## A.      PURPA

Congress enacted PURPA in 1978 to reduce the nation's reliance on foreign energy.  *Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex.*, 422 F.3d 231, 233 (5th Cir. 2005).  One of the several means Congress chose to carry out this ambitious task was to encourage development of alternative energy sources, in particular, "small power production facilities" which "ha[ve] a production capacity of no more than 80 megawatts and use[] biomass, waste, or renewable resources (such as wind, water, or solar energy) to produce electric power."  *FERC v. Mississippi*, 456 U.S. 742, 750 n.11 (1982) (citing 16 U.S.C. § 796(17)(A)).  The Supreme Court has explained:

> Congress believed that increased use of these sources of energy would reduce the demand for traditional fossil fuels.  But it also felt that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and

federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development.

*Id.* at 750–51 (footnotes omitted).[3]

To overcome these barriers to alternative energy growth, § 210(a) of PURPA "directs FERC, in consultation with state regulatory authorities, to promulgate 'such rules as it determines necessary to encourage cogeneration and small power production,' including rules requiring utilities to offer to sell electricity to, and purchase electricity from, qualifying cogeneration and small power production facilities."[4]  *Id.* at 751; 16 U.S.C. § 824a-3(a)–(b).  These cogeneration and small power production facilities are referred to as "qualifying facilities" (QFs).  *Power Res. Grp.*, 422 F.3d at 233.  The absolute requirement of utilities to purchase energy from QFs is tempered by Congress's command that rates paid for such energy "be just and reasonable to the electric consumers of the electric utility and in the public interest."  16 U.S.C. § 824a-3(b)(1).  Accordingly, rates paid by electric utilities to QFs cannot exceed the incremental cost the utility would pay for conventional energy, also known as the "avoided cost."  *See id.* § 824a-3(d) (defining "incremental cost of alternative electric energy" as "the cost to the electric utility of the electric energy which, but for the purchase from such [QF], such utility would generate or purchase from another source").

---

[3]That such barriers are not some figment of an overwrought congressional imagination is born out by the facts in this case, as well as other cases applying PURPA.  *See Power Res. Grp.*, 422 F.3d at 234 (noting the utility declined to purchase from an alternative energy facility, and "instead renegotiated with its previous provider at a rate *higher* than that offered by" the alternative energy provider) (emphasis added).  Of course, utilities may very well have excellent reasons for preferring traditional energy sources to alternative energy, but Congress has determined those reasons must give way to the national need to reduce dependence on foreign energy.  Whether Congress was wise to so determine, or fair to utilities and their customers, is not for this Court to decide.

[4]Cogeneration facilities, which are not at issue in this case, produce "both electric energy and steam or some other form of useful energy, such as heat."  *FERC v. Mississippi*, 456 U.S. at 750 n.11 (citing 16 U.S.C. § 796(18)(A)).

-3-

**B.**     **FERC Regulations**

FERC, acting pursuant to its mandate under PURPA, has created two vehicles by which QFs may require utilities to purchase their energy. *See* 18 C.F.R. § 292.304(d). First, QFs have the option of simply selling energy as it becomes available. *Id.* § 292.304(d)(1). Alternatively, QFs may opt to create a "legally enforceable obligation" (LEO). *Id.* § 292.304(d)(2). A LEO functions much like a bilateral contract, except the utility's "assent" occurs by operation of law: it is an offer the utility cannot refuse. Specifically, § 292.304(d) states:

> Purchases "as available" or pursuant to a legally enforceable obligation. Each qualifying facility shall have the option either:
>
> (1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or
>
> (2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:
>
> (i) The avoided costs calculated at the time of delivery; or
>
> (ii) The avoided costs calculated at the time the obligation is incurred.

*Id.* § 292.304(d).

Significantly, when a QF elects the LEO option—to lock-in energy sales over a period of time—it then has a further choice to make: to sell power either at rates calculated upon delivery, or based on avoided costs calculated at the time the LEO is created. *Id.* § 292.304(d)(2)(i)–(ii).

**C.**     **PUCT Regulations**

In turn, § 210(f) of PURPA requires the states to implement any rule prescribed by FERC

pursuant to § 210.  16 U.S.C. § 824a-3(f)(1).  The Supreme Court has explained states may implement PURPA: "by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules."[5]  *FERC v. Mississippi*, 456 U.S. at 751.

As relevant here, PUCT has attempted to implement the as-available–LEO dichotomy created by § 292.304 via both regulations, and rulings in individual cases.  The cumulative effect of PUCT's efforts is QFs must provide "firm power" in order to create a LEO in Texas.  Otherwise, they of course are entitled to sell their energy to utilities on an as-available basis.  No single rule states this requirement, however, PUCT's Substantive Rules which govern sales by QFs to utilities provide the following definitions:

> (5) Firm power--From a qualifying facility, power or power-producing capacity that is available pursuant to a legally enforceable obligation for scheduled availability over a specified term.
> . . .
> (9) Non-firm power from a qualifying facility--Power provided under an arrangement that does not guarantee scheduled availability, but instead provides for delivery as available.
> . . .
> (13) Quality of firmness of a qualifying facility's power--The degree to which the capacity offered by the qualifying facility is an equivalent quality substitute for firm purchased power or an electric utility's own generation. At a minimum the following factors should be considered in determining quality of firmness:
> (A) reliability of generation and interconnection;
> (B) forced outage rate;
> (C) availability during peak periods;
> (D) the terms of any contract or other legally enforceable obligation, including, but not limited to, the duration of the obligation, performance guarantees, termination

---

[5]FERC adopted a similar formulation following the Supreme Court's decision in *FERC v. Mississippi.  See Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978*, 23 FERC ¶ 61,304, 1983 WL 39627 (May 31, 1983) (noting states may implement PURPA in three ways: "1) through the enactment of laws or regulations at the State level; 2) by application on a case-by-case basis by the State regulatory authority . . . of rules adopted by the FERC; or 3) by any other action reasonably designed to implement [FERC's] rules").

notice requirements, and sanctions for noncompliance;
(E) maintenance scheduling;
(F) availability for system emergencies, including the ability to separate the qualifying facility's load from its generation;
(G) the individual and aggregate value of energy and capacity from qualifying facilities on the electric utility's system;
(H) other dispatch characteristics;
(I) reliability of primary and secondary fuel supplies used by the qualifying facility; and
(J) impact on utility system stability.

16 Tex. Admin. Code § 25.242(c)(5), (9), (13). Two details from the foregoing require additional consideration. The first is contained within the definition of firm power: it is "for *scheduled availability* over a specified term." *Id.* § 25.242(c)(5) (emphasis added). The second is found in several subparts of § 25.242(c)(13) governing whether power is firm, specifically "reliability of generation," "availability during peak periods," "availability for system emergencies," and "reliability of primary and secondary fuel supplies used by the qualifying facility." *Id.* § 25.242(c)(13)(A), (C), (F), (I). Obviously, it is difficult for an intermittent resource, such as the wind, to provide power which is capable of scheduled delivery, and also which meets the foreing firmness factors.

Although PUCT defines firm power and firm power in its regulations, it has made the provision of firm power a prerequisite to formation of a LEO via resolution of individual cases. In particular, as discussed elsewhere in this opinion, (1) via its resolution of this case, and (2) in an earlier case, *P.U.C. Inquiry into Rates Paid for Purchase of Non-Firm Capacity*, No. 5994, 12 P.U.C. BULL. 795 (Oct. 3, 1986) [hereinafter Docket No. 5994]. In the latter case, involving five cogenerator QFs, and a number of rate-setting provisions which are now defunct and not relevant here, PUCT determined firm power equates to power provided under a LEO, while firm power is

power delivered outside of a LEO.  *See id.* at *5, *79.  The Court will refer to this rule as the "firm-power rule" throughout the remainder of this order.

## II.    Facts and Procedural Posture

The six Exelon plaintiffs are self-certified QFs which produce wind-generated electricity.  Indeed, PUCT has found they are, in fact, qualifying facilities.  PUCT Order of May 1, 2009 [#1-4] at 2 [hereinafter PUCT Order].  They operate wind turbines located in the Texas Panhandle, within the Southwest Power Pool reliability region.  *Id.*  Exelon Wind 1, 2, 3, 5, and 6 are each capable of producing ten megawatts of electricity per hour, while Exelon Wind 4 is larger, producing approximately eighty megawatts per hour.[6]  *Id.* 2; State Office of Administrative Hearings (SOAH) Proposal for Decision [#1-3] at 4 n.9 [hereinafter SOAH PFD].  Beginning on November 4, 2005, through October 16, 2006, the Exelon plaintiffs began notifying their host utility, Intervenor Defendant Southwestern Public Service Company, they had energy available for purchase, or would have energy available for purchase within ninety days.[7]  PUCT Order at 2.  Apparently, Exelon sought to negotiate a contract with Southwestern, but the parties failed to agree.  *Id.*  Exelon then attempted to enforce a LEO against Southwestern.  *Id.* at 3.  The salient provisions of this LEO were (1) a twenty-year term; (2) fixed rates for the first nine years, based on Southwestern's "published estimates of its avoided energy costs for 2005 and 2006"; and (3) Southwestern's obligation to

---

[6]The greater capacity is due to the different number and type of turbines employed by Exelon Wind 4.  *See* SOAH PFD at 4 n.9 ("Each of the six of the units but [Exelon] Wind 4 consists of eight Suzlon-64 wind turbine generators.  Each wind turbine generator has a design capacity of 1.25 MW per hour, for a unit capability of 10 MW per hour.  [Exelon] Wind 4 consists of 38 Suzlon S-88 wind turbine generators, each with a design capability of 2.1 MW per hour, for a unit capability of 79.8 MW per hour.").

[7]The ninety-day availability period is not at issue in this case.  It is a PUCT regulation, upheld by the Fifth Circuit, limiting QFs' ability to impose a LEO to within ninety days of being able to actually provide power.  *See* 16 Tex. Admin. Code § 25.242(f)(1)(B); *Power Res. Grp.*, 422 F.3d at 233.

purchase 100% of the energy produced by Exelon during the twenty-year term.[8]  *Id.*

Southwestern acknowledged its obligation to purchase any and all power provided by Exelon, *id.*, and apparently continues to purchase power from Exelon as it is supplied.[9]  However, Southwestern refused to acknowledge the existence of a LEO, and insisted the rates are governed by Tariff 7009, which applies to power supplied to Southwestern on an as-available basis.  *See id.*

## A.    Proceedings Before PUCT and SOAH

On June 27, 2007, Exelon filed a complaint with PUCT, arguing Southwestern was in violation of PUCT Subst. R. 25.242 for failing to acknowledge the existence of a LEO, and for failure to pay at the fixed rates purportedly established by Exelon's attempted LEO.  *Id.*  The matter was referred to SOAH.  *Id.*  After notice, briefing, and a hearing, the SOAH ALJ found, and PUCT subsequently agreed, *inter alia*, Exelon's power was "non-firm" under PUCT Subst. R. 25.242(c)(5), (9), (13), and therefore found Southwestern was correct in only paying the as-available rate under Tariff.  The ALJ found—and PUCT agreed—that because the energy produced by Exelon was firm, Exelon was precluded from forming a LEO.  *See id.*

---

[8]In fact, the only reasonable, objective interpretation of this provision of the attempted LEO is Exelon undertook to supply all of its output to Southwestern for the life of the LEO; in other words, it is an attempt to conclude a LEO for all of Exelon's output.  *See, e.g.*, Notice of Impending Delivery of Energy and Establishment of a Legally Enforceable Obligation and Election of Payment Options [#76-1] at 8 (Nov. 4, 2005) ("Accordingly, this letter serves as notice to [Southwestern] of the establishment of a legally enforceable obligation of [Southwestern] to purchase from [Exelon] Wind 1 *all of the energy produced* by the Project (other than station use) . . . .").  Intervenor Occidental has attempted to dispute this, and agues whether Exelon in fact undertook to supply all power is a fact issue.  However, this dispute is irrelevant to the narrow issue at hand.  PURPA and § 292.304(d) nowhere require QFs to guarantee delivery of their full output to create a LEO, nor  are LEOs limited to capacity-based terms only.  More importantly, as discussed below, PUCT's firm-power rule precludes a stand-alone wind QF from creating a LEO, regardless of whether it undertakes to sell all its output to the utility.

[9]Indeed, counsel reiterated this concession at the hearing.  There is no dispute as to Exelon's entitlement under PURPA to have its power purchased by Southwestern.  Rather, the issue is whether a QF—such as Exelon—whose power is not "firm" under PUCT's understanding, is nevertheless entitled to create a LEO.

B.      **Petition for Enforcement to FERC**

Having exhausted its state administrative remedies, Exelon filed a Petition for Enforcement and Declaratory Order with FERC on September 24, 2009.  Before FERC, Exelon argued, as it does before this Court, that PUCT has failed to implement PURPA, specifically § 292.304(d), because PUCT's firm-power rule precludes stand-alone wind QFs from concluding LEOs.  Pet. for Enforcement [to FERC] [#1-1] at 29–37.

FERC received extensive briefing on the issue by Exelon, PUCT, Xcel Energy Services, Inc. (a company related to Southwestern), Occidental, and assorted non-parties, most of whom supported Exelon.[10]  *See* Decl. Order at 5–7.  On November 19, 2009, FERC issued its Notice of Intent Not to Act and Declaratory Order.  In the order, FERC declined to initiate an enforcement action against PUCT.  *Id.* at 8.  However, FERC went on to explain in some detail why it nevertheless agreed with Exelon's position, and found PUCT's firm-power rule constituted a failure to implement PURPA.[11]  *Id.* at 9 ("[W]e find that the Texas Commission's decision denying [Exelon] Wind a legally enforceable obligation, and the requirement in Texas law that legally enforceable obligations are only

---

[10]These included (1) several alternative energy trade associations, specifically the American Wind Energy Association, the Solar Energy Industries Association, the Project for Sustainable FERC Energy Policy, the Texas Renewable Energy Industries Association, the Wind Coalition; and (2) alternative energy developers,  and energy cooperatives, specifically Distributed Wind Systems, LLC, Golden Spread Electric Cooooperative, Montana Small Independent Renewable Generators, and NRG Energy, Inc. Decl. Order at 5–6.  Nearly all of the foregoing intervenors apparently supported Exelon's position.  *See id.*  Exelon, Xcel, and Occidental also filed assorted answers, which FERC declined to consider.  *Id.* at 7.

[11] The Parties have devoted considerable time and effort debating what degree of deference, if any, the Court must afford the FERC Declaratory Order.  The Court need not answer this question, because the Court has  reviewed the statute and regulations de novo, and independently reaches the same conclusion as FERC.  Alternatively, the Court finds: (1) § 292.304(d) is unambiguous, (2) FERC's interpretation of it is fully consistent with the language of the rule, and therefore (3) the Court should defer to FERC's interpretation.  *See Hardy Wilson  Mem'l Hosp. v. Sebelius*, 616 F.3d 449, 458 (5th Cir. 2010).

available to sellers of 'firm power,' as defined by Texas law, are inconsistent with PURPA and our regulations implementing PURPA, particularly section 292.304(d) of our regulations.").

Exelon then filed this suit, seeking declaratory and injunctive relief.[12] Southwestern, the local utility, and Occidental, an industrial customer of Southwestern, moved for and were granted leave to intervene. The Court previously denied motions to dismiss, finding Exelon had pleaded an implementation challenge. Order of Sept. 14, 2010 [#46] at 11.     The case was stayed for a time while Exelon pursued an appeal in state court of PUCT's finding that the energy generated by Exelon is not firm power, but was reopened when Exelon nonsuited the state-court appeal. The Court has held a full hearing, as well as a status hearing on this case, at which all parties were represented by counsel, and advanced their arguments with considerable skill. Presently, there are cross-motions for summary judgment pending from all parties, as well as discovery motions brought by Occidental and Southwestern.

## Discussion

Although the parties have filed ream after ream of paper in this case, this lawsuit is about a single issue: Does PUCT have discretion, in implementing PURPA, to create a policy effectively excluding some types of Qualifying Facilities (QFs) from creating Legally Enforceable Obligations (LEOs), pursuant to Federal Energy Regulatory Commission (FERC) regulations? Because the Court finds PUCT does not have such discretion, and finds PUCT's attempts to do so constitute a failure to implement PURPA, the Court grants summary judgment for Exelon.

---

[12]Exelon also appealed PUCT's decision to a state district court, but ultimately nonsuited the appeal, making the PUCT Order final.

The Court will first discuss its own jurisdiction and a statutory prerequisite to this suit, before turning to the pending discovery motions, and then to the summary judgment motions.

## I.     Jurisdiction: As-Applied Versus Implementation Challenges

PURPA provides two avenues of review of state utility regulatory authorities' actions: implementation and "as applied" challenges.  *See Power Res. Grp.*, 422 F.3d at 234–35.  "An implementation claim involves a contention that the state agency . . . has failed to implement a lawful implementation plan under § 824a-3(f) of PURPA, whereas an 'as-applied' claim involves a contention that the state agency's . . . implementation plan is unlawful, as it applies to or affects an individual petitioner."  *Id.* at 235 (internal quotations omitted).  Federal district courts typically have jurisdiction over implementation claims in which the party has first petitioned FERC to bring an enforcement action, and FERC declines to do so.  *Id.* (citing *Indus. Cogenerators v. FERC*, 47 F.3d 1231, 1234 (D.C. Cir. 1995)); *see also* 16 U.S.C. § 824a-3(h). Federal courts generally may not hear "as applied" claims, because jurisdiction over such claims is reserved to the state courts.  *Power Res. Grp.*, 422 F.3d at 235; *see also* 16 U.S.C. § 824a-3(g).

Defendants question whether this Court has jurisdiction over Exelon's claims, asserting they amount to "as-applied," rather than implementation challenges.  The Court disagrees.  PUCT's ruling, as well as the SOAH PFD it generally adopted, are both premised upon the "firm power" distinction created by PUCT in its attempt to implement PURPA.  That Exelon is in fact challenging PUCT's implementation of PURPA, rather a particular application, is confirmed by the reasoning in the FERC Declaratory Order, and the positions taken by various intervenors before FERC. Significantly, at hearing, counsel for Defendants could provide no satisfactory explanation for how any other wind energy provider in Texas could obtain a LEO under the firm-power rule, without

positing additional requirements, such as linking multiple energy sources together, or the use of cutting-edge energy storage technology. In other words, counsel effectively conceded a wind-energy QF, standing alone, cannot provide "firm power" as defined by PUCT, and so cannot create a LEO in Texas. There is nothing in the record, nor any argument before the Court, which would limit the foregoing conclusion to Exelon alone. As such, this case is an implementation challenge, over which the Court has jurisdiction.[13] *See* Order of Sept. 14, 2010 [#46] at 11.

## II.    Petition to FERC

In addition, Exelon has fulfilled the statutory prerequisite to bringing this suit. PURPA § 210(h) authorizes FERC to enforce its PURPA regulations when a state regulatory commission's implementation of PURPA is "inconsistent or contrary to the Commission's regulation." 16 U.S.C. § 824a-3(h)(2)(A). In addition, qualifying small power producers may petition FERC to bring a § 210(h) enforcement action. 16 U.S.C. § 824a-3(h)(2)(B). If FERC, in its discretion, declines to do so within sixty days, then the petitioner may bring its own action "in the appropriate United States district court to require such State regulatory authority . . . to comply with such requirements." *Id.* Exelon petitioned FERC to bring a regulatory action in September 2009, Orig. Compl. [#1-1], Ex.

---

[13]The Court also notes Exelon has standing to bring this suit, as the Exelon plaintiffs have attempted to act as QFs under PURPA, and are directly impacted by PUCT's substantive rule. This dispute is ripe, because Exelon has already sought and been denied relief before PUCT.

A, and FERC declined to do so on November 19, 2009, *id.*, [#1-5], Ex. B at 1, 8 [hereinafter Declaratory Order].  As such, Exelon has fulfilled the statutory prerequisites to bring this suit.

## III.    Discovery Motions

Occidental has moved to strike "the purported facts" set forth in Exelon's motion for summary judgment.  Occidental's Mot. to Strike [#96] at 1.  Occidental disputes a variety of fact issues, such as whether Exelon committed to supply *all* output to Southwestern, and whether Exelon met all other prerequisites for establishment of a LEO.[14]  These matters are irrelevant to the narrow issue before the Court: whether PUCT has implemented PURPA in accordance with § 292.304(d).  Because the Court has found this case is entirely a matter of law, requiring no factual determinations, the Court DENIES the motion.

On a similar note, Occidental and Southwestern have both moved to compel discovery and depositions, relating to such matters as Exelon's standing as a QF, whether this case is in fact an as-applied challenge, the requirements for a QF to establish a LEO, and damages.  Exelon's standing is plainly established by its complaint, and by the findings of PUCT, as the Court addressed earlier in this opinion.  Furthermore, PUCT has already found the Exelon entities are each qualifying facilities.  PUCT Order at 2.  Also, the Court has already determined, as a matter of law, this case is an implementation challenge, rather than an as-applied suit.  The other issues Occidental and

---

[14]Occidental seeks discovery on whether the Exelon plaintiffs are in fact QFs.  Apparently, the Exelon plaintiffs are self-certified QFs, which is not unusual.  *See Indep. Energy Prods. Ass'n v. Cal. Pub. Utilities Comm'n*, 36 F.3d 848, 855 (9th Cir. 1994); 18 C.F.R. § 292.207(a).  No party has disputed this previously, and both the ALJ and PUCT found the Exelon entities are QFs.  The Court will not revisit this finding, both because it is beyond the scope of this implementation challenge, and because FERC, not this Court, is the proper forum for Occidental to challenge Exelon's certification.  *Power Res.*, 422 F.3d at 236 n.2 ("Therefore, FERC alone must determine which facilities are QFs."); 18 C.F.R. § 292.207(d) (governing procedures for revocation of QF status before FERC); *see also Indep. Energy Prods. Ass'n*, 36 F.3d at 853–54 ("The structure of PURPA and the Commission's regulations, reflect Congress's express intent that the Commission exercise exclusive authority over QF status determinations.").

Southwestern seek discovery on are irrelevant.[15]  Therefore, the motions [##75, 104] are DENIED.

## IV.    Summary Judgment Motions

## A.    Legal Standards

## 1.    Summary Judgment

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the

---

[15]In particular, it is irrelevant whether energy storage technologies, or combinations of disparately located energy production facilities, would allow QFs to generate "firm power" under PUCT regulations.  As discussed elsewhere in this opinion, PURPA and the relevant FERC regulations contain no such limit on, or prerequisite to, obtaining QF status.  Even assuming Occidental and Southwestern are correct in their belief such circumstances would allow a wind-power QF to produce "firm power," PUCT's substantive rule nevertheless fails to implement PURPA, because the relevant FERC rule, § 292.304(d), entitles QFs (as defined by PURPA and FERC) to create LEOs.  The entitlement is not limited to QFs who can also meet PUCT's definition of firm power.  In fact, PUCT's firm-power requirement is precisely the sort of state regulatory barrier to alternative energy development Congress determined to override via PURPA.  Therefore, any dispute of fact on these points is immaterial.

nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact dispute. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## 2.     Implementation of PURPA

"State regulatory authorities . . . are required to implement PURPA pursuant to the rules and regulations promulgated by FERC." *Power Res. Grp.*, 422 F.3d at 236 (citing 16 U.S.C. § 824a-3(f)). The Court reviews PUCT's "implementation of PURPA with deference because '[a] state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and QFs.'" *Id.* (quoting *N. Am. Natural Res., Inc. v. Mich. Pub. Serv. Comm'n*, 73 F. Supp.

2d 804, 807 (D.Mich.1999)).  "[T]he state's authority to implement [PURPA] is admittedly broad."

*Indep. Energy Prods. Ass'n v. Cal. Pub. Utilities Comm'n*, 36 F.3d 848, 856 (9th Cir. 1994).  As

such, it appears a state rule will be upheld in the Fifth Circuit if it implements PURPA "on its face."

In construing federal regulations, the Court begins "with the assumption that the words were meant

to express their ordinary meaning."  *Bouchikhi v. Holder*, 676 F.3d 173, 177 (5th Cir. 2012).

## B.      Application

The Court agrees with FERC and Exelon, and finds PUCT has failed to implement PURPA.

Simply put, § 292.304(d), by its unambiguous, plain language, entitles "each" QF to sell energy

"either" as available "or" pursuant to a LEO.  However, as the ALJ astutely observed, and PUCT

ultimately held in this case, under PUCT's regulatory regime, only QFs whose power is firm can

avail themselves of a LEO in Texas.  The Court finds this rule fails on its face to implement PURPA,

because it  rewrites and drastically limits § 292.304(d), rather than implementing it.  In particular,

the Court finds (1) all wind-energy QFs are entitled to create LEOs, regardless of whether their

power is firm, and (2) alternatively, PUCT has improperly redefined what type of entity qualifies as

a QF.

## 1.      All QFs are Entitled to Create LEOs

Although the Fifth Circuit has affirmed the states' authority to vary the parameters of LEOs,

particularly as to when in time they are created, it has noted "states *must* provide for legally

enforceable obligations as distinct from contractual obligations."  *Power Res. Grp.*, 422 F.3d at 238

(emphasis added).  Section 292.304(d) unambiguously entitles QFs to create LEOs.  The import of

§ 292.304(d) has been repeatedly confirmed by FERC.  *See* Decl. Order at 10–12; Order No. 69,

*Small Power Production and Cogeneration Facilities; Regulations Implementing Sec. 210 of*

*[PURPA]*, 45 Fed. Reg. 12214, 12224 (Feb. 25, 1980) (noting "as available" means "without legal obligation"); *id.* at 12224 ("[Section 292.304](d)(2) permits a qualifying facility to enter into a contract or other legally enforceable obligation to provide energy or capacity over a specified term."). FERC was crystal clear on this point in 1980: "The Commission intends that rates for purchases be based, *at the option of the qualifying facility*, on either the avoided costs at the time of delivery *or* the avoided costs calculated at the time the obligation is incurred." Order No. 69, 45 Fed. Reg. at 12224 (emphasis added). "This change enables a qualifying facility to establish a fixed contract price for its energy and capacity at the outset of its obligation . . . ." *Id.* FERC has confirmed this in other orders: "[Section 292.304(d)] gives each QF the option either to sell its energy on an as-available basis with no advance commitment, or to sell its capacity and/or energy pursuant to a legally enforceable obligation taken on in advance." *Entergy Servs., Inc.*, Nos. ER05-1065-011, OA07-32-008, 137 FERC P 61199, at *5 (Dec. 15, 2011). "The regulations specifically allow rates for the purchase of QF energy or capacity pursuant to a contract over a specified term to be based on avoided costs calculated, at the option of the QF, at the time of delivery or at the time the obligation is incurred." *N.Y. State Elec. & Gas Co.*, No. EL95-28-000, 71 FERC P 61027, at *14 (Apr. 12, 1995) (citing 18 C.F.R. § 292.304(d)(2)).

FERC's other regulations are consistent with this understanding, and belie the parade of horribles raised by Defendants asserting that allowing firm QFs to create LEOs would be contrary to the public interest. The avoided cost system (which protects the public interest, and guarantees the just and reasonable rate requirement, by assuring utilities pay no more than their avoided cost) applies to fixed-rate LEOs just as much as to as-available energy sales (or to LEOs based on price determined at delivery). *See* 18 C.F.R. § 292.304(a)(2), (d)(2). "If purchase rates are set at the

utility's avoided cost, consumers are not forced to subsidize QFs because they are paying the same amount they would have paid if the utility had generated energy itself or purchased energy elsewhere." *Indep. Energy*, 36 F.3d at 858.  Nor can Defendants object that rates locked in through a LEO might, in some instances, exceed avoided costs at various points in time throughout the life of the LEO (due to price fluctuations, and errors in estimating future avoided costs when the LEO is created).  "Federal regulations provide that QFs are entitled to deliver energy to utilities at an avoided cost rate calculated at the time the contract is signed." *Id.*  "The Commission recognized that, at times, the avoided cost rate provided in the contract might be greater or less than the utility's current avoided costs but that certainty as to rate was important." *Id.*  Furthermore, FERC regulations regarding determining avoided costs have already taken into account issues such as reliability and capacity.  *See* 18 C.F.R. § 292.304(e)(2).  Accordingly, Congress's command that rates conform to the public interest, and be just and reasonable, has already been given effect by FERC's regulations.

In fact, as noted by *Independent Energy*, 36 F.3d at 858, FERC carefully considered the importance of cost certainty when it created the entitlement to enter into LEOs:

> The Commission recognizes this possibility [that avoided costs at a particular time might be lower than the rates provided in a LEO] but is cognizant that in other cases, the required rate will turn out to be lower than the avoided cost at the time of purchase . . . .  Many commentators have stressed the need for certainty with regard to return on investment in new technologies.  The Commission agrees with these . . . arguments, and believes that, in the long run, "overestimations" and "under estimations" of avoided costs will balance out.

Order No. 69, 45 Fed. Reg. at 12224.

It bears noting FERC was well aware of the firm and non-firm distinction when it created § 292.304(d).  *See* Order No. 69, 45 Fed. Reg. at 12225 (explaining history of and differences

between firm and non-firm power).  Also before FERC at the time was a piece of Congressional

history relied on by Southwestern,[16] the Conference Committee Report reconciling the House and

Senate versions of PURPA, which noted:

> The conferees expect that the Commission, in judging whether the electric power supplied by the cogenerator or small power producer will replace future power which the utility would otherwise have to generate itself either through existing capacity or additions to capacity or purchase from other sources, will take into account the reliability of the power supplied by the cogenerator or small power producer by reason of any legally enforceable obligation of such cogenerator or small power producer to supply firm power to the utility.

H.R. REP. NO. 1750, 95th Cong., 2d Sess. at 99, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS

at 7832 (quoted in Order No. 69, 45 Fed. Reg. at 12225).

FERC, well aware of such concerns, nevertheless used unambiguous language in

§ 292.304(d) to give "each" QF the option to choose "either" to sell as available "or" pursuant to a

LEO.  FERC could readily have opted for any number of different approaches, but, mindful of the

importance of cost-certainty to the development of alternative energy, chose to grant QFs the right

to establish LEOs.  *See* Order No. 69, 45 Fed. Reg. at 12224.

It is thus apparent FERC has made a deliberate and considered choice to give QFs the right

to create LEOs, which is reflected in the language of § 292.304(d), and giving the section the

foregoing meaning is fully consistent with the wider corpus of PURPA regulations.

**2.      The Firm-Power Rule Prevents LEO Formation by Stand-Alone Wind QFs**

PUCT, in its Conclusions of Law, determined, "The energy produced by the [Exelon] Wind

Companies is nonfirm Power."  PUCT Order at 6.  This finding is crucial, and bears careful

---

[16]The Court also notes the Conference Report (1) is not an actual statute, and (2) simply advised FERC to consider power reliability in determining whether an alternative energy source could replace future capacity needed by a utility, which is a different issue from simple sales of power.

examination.  PUCT did not find Exelon had failed to make a binding offer, or had failed to offer

all its output, nor did it make any of a number of fact-specific findings by which Exelon might have

failed to create a LEO.  Rather, PUCT determined the "energy produced" is "nonfirm."  *Id.*  That this

was not a careless misstatement is confirmed by other portions of the Order:

> [T]he ALJ found that the energy produced by the [Exelon] Wind Companies is non-
> firm power.  Therefore, the [Exelon] Wind Companies did not comply with the
> conditions for creating a legally enforceable obligation and the appropriate rate at
> which [Southwestern] must purchase capacity and energy from the [Exelon] Wind
> Companies is established in [Southwestern]'s Tariff No. 7009.
>
> The Commission agrees with the ALJ . . . .

*Id.* at 1.

Further confirmation may be gleaned from the SOAH PFD itself, which contains a lengthy

discussion on why Exelon's stand-alone wind power is nonfirm.  *See* SOAH PFD at 14–31.  The

PFD is well-written, thoughtful, and contains a mostly unassailable assessment of both PUCT's

regulations, and Texas jurisprudence governing statutory construction.  In short, the Court has no

doubt the ALJ correctly applied Texas law, save for his finding that *all* wind-energy is necessarily

nonfirm (which is the single substantive part of the PFD which PUCT judiciously rejected).

In so doing, the ALJ overruled Exelon's contention its alleged offer of total output made its

power firm, and instead accepted the contention of Southwestern, Occidental, and PUCT that "the

intermittency of wind resources prevents the [Exelon] Wind Companies' power from being available

for scheduling purposes," and thus, "without scheduled availability of the power, the [Exelon] Wind

Companies' power [is] nonfirm."[17]  *Id.* at 15.  The ALJ concluded:

---

[17] It is unclear exactly how predictable or reliable energy generation must be to satisfy the firm-power rule.
Notably however, Southwestern argued before SOAH that "'scheduled availability' of power meant the ability to provide
the Southwest Power Pool with a list of specific amounts of power needed at a given hour that will be dispatchable from

> The [Exelon] Wind Companies did not comply with the conditions for creating a legally enforceable obligation. As discussed . . . a requirement for creating a legally enforceable obligation is the provision of firm power. This proposal for decision concludes that the [Exelon] Wind Companies cannot provide firm power. In the absence of that capability, the [Exelon] Wind Companies cannot create a legally enforceable obligation.

*Id.* at 38 (footnotes omitted).

After finding Exelon's energy is nonfirm, PUCT then cited Substantive Rule 25.242(c)(9), (13), which define firm and nonfirm power, and concluded, "The Appropriate rate at which SPS should be required to purchase capacity and energy from the [Exelon] Wind Companies is that established by Tariff 7009." *Id.* Tariff 7009 governs power provided on an as-available basis. *See id.* at 3. In other words, PUCT found Exelon produces nonfirm power, and therefore cannot establish a LEO. PUCT declined to go so far as the ALJ, and rejected the ALJ's conclusion that "wind-generated power is not readily available." *Id.* at 6. In doing so, PUCT noted:

> The Commission disagrees with this broad statement encompassing all wind-generated power. The Commission notes that disparate wind patterns in the diverse geographic regions of the state can result in significantly different characteristics for wind-generated power. Further, combining wind with energy storage techniques or other energy sources, like solar energy, can also result in significant differences. These aspects were not analyzed in this case. In addition, the Commission concludes that this finding is not necessary to reach a decision on the issues presented in this case.

PUCT Order at 1–2.

Restated, PUCT left open three interrelated factual possibilities by which a wind-generated power could be made firm: (1) wind in some areas might be constant enough, (2) by combining wind with other power sources, and (3) by the use of energy storage techniques. In so rejecting the ALJ's sweeping characterization, PUCT exercised prudent restraint. However, what PUCT has

---

specific generation sources at specific hours on specific days." SOAH PFD at 16.

-21-

nevertheless done is stated a rule which prevents stand-alone, wind-energy QFs (and, by implication, other stand-alone QFs who make use of intermittent energy sources) from ever precluding a LEO unless they can provide firm energy. Regardless of whether this means in terms of scheduled availability in § 25.242(c)(5), or in terms of the firmness factors in § 25.242(c)(13), PUCT has drastically curtailed the ability of wind QFs to create LEOs, because a stand-alone QF will never, as a practical matter, be able to produce firm power. Because this fails on its face to implement PURPA, the Court finds the firm-power rule is preempted by federal law.

The Court will now turn to various other objections raised by PUCT and Southwestern in their cross motions for summary judgment.[18]

### 3.    PUCT's Arguments

PUCT raises a battery of arguments, which the Court will address in turn, beginning with PUCT's reliance on the Fifth Circuit's decision in *Power Resource Group*.

In *Power Resource Group*, the Fifth Circuit considered whether PUCT's ninety-day rule was a valid implementation of PURPA. The ninety-day rule simply limits when in time a LEO can be created; no LEO can be established more than ninety days before the QF has power available, or will have power available. After careful analysis, and noting the discretion afforded the States in determine when a LEO is formed, the Fifth Circuit upheld the rule. *Id.* at 240. However, at no point did the Fifth Circuit endorse any substantive limit imposed by the state, contrary to FERC regulations. Unlike the firm-power rule, any wind QF can comply with the ninety-day rule; it is simply a matter of timing. Although there are no doubt considerable practical expenses and

---

[18]There is no need to separately discuss Occidental's summary judgment motion, because it simply incorporates by reference the arguments raised by PUCT and Southwestern. Occidental's Mot. Summ. J. [#109] ¶ 7.

difficulties involved, in theory any QF can comply with the ninety-day rule through careful planning in advance, such as in what sequence to seek financing, obtain permitting, and begin different phases of construction, in relation to when to send LEO paperwork to a utility.  All of these are things the QF would be doing anyway; the only barrier imposed by the ninety-day rule is one of sequencing and timing of such activities.  By contrast, the firm-power rule is simply insurmountable for an entire class of QFs.  No sequence of permitting, financing, and construction will magically transform the vagaries of the wind into the constant, predictable stream of energy demanded by the firm-power rule.  As such, this case falls outside the scope of guidance offered by *Power Resource Group*.

Second, *Power Resource Group* involved substantially different facts: a QF whose facility was not yet complete, and would not be complete within ninety days, nevertheless sought to establish a LEO.  *Id.* at 233.  Here, Exelon's facilities apparently complied with the ninety-day rule; indeed, the Court understands they are all functioning as of this writing, and Southwestern is purchasing power from Exelon.  This is not a case of an unbuilt QF attempting to lock-in pricing at some arbitrary point in time; rather, in compliance with the ninety-day rule, Exelon attempted to lock-in pricing at a date related to actual delivery of energy.  As such, the legitimate concerns over price manipulation which may have underlain the decision in *Power Resource Group*, and which presumably informed PUCT's determination to establish the ninety-day rule, are not present in this case.

Put another way, *Power Resource Group* reviewed an essentially procedural rule, governing when and how a LEO is formed, whereas the firm-power rule is one of substance, determining whether some types of QF can ever obtain a LEO.  "On its face, the 90-day rule implements PURPA and its regulations regarding LEOs by allowing QFs to create LEOs and secure pricing based on the

LEOs . . . ." *Id.* at 239.  By contrast, the firm-power rule on its face *denies* some QFs the ability to create LEOs.  And while state regulatory agencies have wide procedural latitude in implementing PURPA, they have no discretion to fail to implement it.  To amend a rule's substance, as PUCT has done, is to fail to faithfully implement it.[19]

The Court now examines PUCT's other arguments, beginning with its assertion the firm-power rule actually tracks the language of § 292.304(d):

> The current PUCT Rule 25.242(c)(9) defines "non-firm power from a qualifying facility" as "[p]ower provided under an arrangement that does not guarantee scheduled availability, but instead provides for delivery as available." []16 Tex. Admin. Code § 25.242(c)(9).  This tracks Section 292.304(d)(1) of FERC's PURPA rules, which allows QFs to sell their power on an as available basis. 18 C.F.R. § 292.304(d)(1). PUCT Rule 25.242(c)(5) defines "firm power," on the other hand, as "[f]rom a qualifying facility, power or power-producing capacity that is available pursuant to a legally enforceable obligation for scheduled availability over a specified term."  16 Tex. Admin. Code § 25.242(c)(5).  This tracks Section 292.304(d)(2) of FERC's PURPA rules, under which a QF may sell power pursuant to a LEO over a specified term. 18 C.F.R. § 292.304(d)(2).

Def.'s Resp. [#80] at 19–20.  In other words, PUCT takes the position that its firm power–nonfirm power distinction implements § 292.304(d)'s option to sell power either as available, or pursuant to a LEO. The Court disagrees, and finds—far from tracking § 292.304—the firmness rule substantially conflicts with it.  Both the plain language of § 292.304(d), and FERC's persuasive explanations of both its meaning and purpose, do not limit the LEO option to certain types of QF.  Rather, all QFs are entitled to opt for a LEO.  PUCT has not "filled [a] gap," *id.*, rather, it has engrafted an

---

[19]PUCT also notes several other states make a similar distinction between firm and nonfirm power.  However, peer pressure is no excuse for contravening the will of Congress; the PUCT rule must stand or fall on its own merits.

additional, prerequisite for establishing a LEO: a QF seeking to create a LEO in Texas must not only be a QF, it must also meet the firmness requirement.[20]

Looking at this difference another way, § 292.304 authorizes QFs to *choose* whether to sell power as-available, or under a LEO. By contrast, via Rule 25.242, PUCT has made the decision for them: nonfirm QFs can only sell on an as-available basis.

PUCT claims the firm-power rule simply implements the *obligation* part of the LEO equation, as to the QF. "By its plain language, a 'legally enforceable obligation' under the FERC's rules requires an *obligation* to deliver power." PUCT's Resp. [#80] at 12. This argument has greater intuitive appeal, but the Court is still unpersuaded, for two reasons. First, the argument is simply innaccurate: PUCT is requiring more than a simple "obligation to deliver power." It is requiring the power delivered be "firm," which , as explained previously, PUCT defines in a way which generally excludes wind-energy QFs. Second, the argument ignores the possibility of an obligation to deliver power which is premised on all output, rather than a specified delivery schedule, which is indeed precisely what Exelon attempted in this case.

PUCT further argues "The FERC rule includes no explanation of when power is sold 'as available' and when it is sold pursuant to an enforceable delivery obligation. The PUCT appropriately developed its own standards on this, consistent with the language of the FERC rule." PUCT's Resp. [#80] at 20. However, this argument overlooks the plain language of § 292.304(d), which allows QFs, not PUCT, to determine whether and when power under a LEO will be sold as-

---

[20]PUCT argues, "At the very least, the FERC rule is silent as to whether a LEO is available for nonfirm power, and the PUCT's rule appropriately filled that gap." PUCT's Resp. [#80] at 12. Section 292.304's "silence" as to nonfirm power is a red herring, because the firm–nonfirm dichotomy as defined in Rule 25.242 is a creation of PUCT, not of PURPA or FERC. Also, because the plain language of § 292.304 applies to all QFs, there is no gap to fill. PUCT also claims FERC has recognized the concept of firm power, but the reference in question is from an order discussing the proper rates, not LEO formation.

available, or under scheduled delivery.  Furthermore, this argument skips past the heart of the problem with PUCT's firm-power rule: it precludes a wind QF, standing alone, from ever forming a LEO, either for a fixed rate, or on an as-available basis.

PUCT also denies having categorically excluded wind and other intermittent QFs from establishing LEOs.  PUCT's Resp. [#80] at 26.  However, its very argument confirms it has, in fact, done so.  PUCT disagreed with the ALJ's conclusion that "wind power is not readily available," noting:

> The Commission disagrees with this broad statement encompassing all wind-generated power. The Commission notes that disparate wind patterns in the diverse geographic regions of the state can result in significantly different characteristics for wind-generated power. Further, combining wind with energy storage techniques and other energy sources, like solar energy, can also result in significant differences. These aspects were not analyzed in this case.

PUCT Order at 1–2.  In other words, a QF might hypothetically comply with PUCT's firm-power rule by having wind farms all over the state, or by storing energy, or by utilizing other energy sources, or, less probably, by being located in some—probably nonexistent—location where the wind is actually constant.[21]  For purpose of summary judgment, the Court presumes Defendants are correct in these suppositions, and accepts their contention wind QFs can provide firm power by the above methods.  However, this does not save the firm-power rule, because the rule nevertheless represents an additional, substantive requirement which contravene the plain language of § 292.304.

Neither Congress nor FERC limited the definition of QFs to facilities which use technology, or diverse placement of turbines, to achieve "firm power."  In fact, what PUCT has done is to

---

[21]One practical problem with this hypothetical is that it might be very difficult to construct and maintain wind facilities "in diverse geographic regions," which are both large enough in terms of output to be profitable, and yet small enough to remain under the eighty-megawatt limit to maintain QF status.  It is also unclear whether there would ever be sufficient geographic diversity within the catchment area of any given utility to create firm power.

enshrine one of the underlying reasons for utilities' reluctance to purchase from wind providers—the intermittent nature of the energy provided—into the very rule by which Congress intended to overcome such reluctance. The Court recognizes utilities and their customers have good reasons to prefer constant, predictable flows of energy. But the Court is bound to apply the law, and the law says their preferences must bow before the national interest in developing alternative energy.

Further, PUCT argues its firm-power rule lies within the scope of discretion given to the states to implement FERC rules. However, the authorities PUCT cites are not on point: they speak to "whether and when" a LEO is established in a particular case, *see, e.g.*, 18 C.F.R. Part 292 *New PURPA Section 210(m) Regulations Applicable to Small Power Production and Cogeneration Facilities*, 119 FERC ¶ 61,305 (2007), and also to "the parameters for creating" a LEO, such as when in time a LEO can be formed, *see Power Res. Grp.*, 422 F.3d at 239 (upholding the ninety-day rule). At issue here is not whether and when a particular LEO was formed, or a technical question of when (temporally) a LEO can be formed. Rather, PUCT has gone beyond such implementory policies, and has effectively altered the substance of PURPA within the state of Texas, to the detriment of the very alternative-industry providers Congress determined to benefit through PURPA.

Finally, PUCT asserts Exelon's challenge fails, because it is directed at the PUCT Order in this case, rather than the Substantive Rules containing the firm power definition. The Court disagrees. As mentioned earlier, states implement PURPA both through regulations, and through rulings in individual cases. *FERC v. Mississippi*, 456 U.S. at 751. Here, in a ruling in an individual case, PUCT has interpreted its firm-power rule in a way which fails to implement PURPA, and the rule as newly interpreted is a proper subject for implementation review. *See id.* In addition, QFs must be able to bring implementation challenges in the context of individual rulings, otherwise a

state could avoid its duty to implement PURPA by acting only through such rulings.

Accordingly, PUCT's Motion for Summary Judgment [#80] is DENIED.

**4.       Southwestern's Arguments**

Southwestern, the utility, generally makes the same arguments raised by PUCT above, and those arguments likewise fail.  In addition, Southwestern argues: (1) QFs which provide nonfirm power have "chosen" to provide energy on an as-available basise, (2) FERC's position frustrates Congressional intent that prices paid to QFs be just and reasonable; (3) PUCT implemented § 292.304(d) via its own Rule 25.242, not through the PUCT Order in this case; and (4) res judicata and collateral estoppel preclude any reversal of the PUCT Order.  The Court will address each in turn.

Southwestern asserts: "The PUC decided that a QF offering only non-firm energy has in fact made the choice to offer as available energy."  Southwestern's Resp. [#76] at 9.  This argument fails because, as the SOAH ALJ ably explained, it is the very nature of wind power which makes in nonfirm.[22]  There is no choice involved.

Turning to the just-and-reasonable rates argument, PURPA requires that rates paid to QFs "be just and reasonable and in the public interest," 16 U.S.C. § 824a-3(b); *see also* 18 C.F.R. § 292.304(a).  However, Southwestern's attempt to use this statute to support the firm-power rule fails.  This is because the just and reasonable requirement is a directive aimed at FERC, and FERC has "clearly weighed Congress's desire to promote cogeneration while not burdening ratepayers, and

---

[22]Indeed, Southwestern—with perhaps either a deficient sense of irony, or out of sheer gall—suggests one "firming" technique by which a wind QF could provide firm power would be "back-up fossil-fueled generation." Southwestern's Resp. [#76] at 9 n.10.  The Court is fairly certain requiring QFs to maintain back-up fossil-fueled capacity is not what Congress had in mind in enacting PURPA.

concluded that requiring utilities to pay *full* avoided costs properly balanced these interests." *Indep.*
*Energy*, 36 F.3d at 858.  Similarly here, FERC—presumably having considered the full range of
Congressional concerns expressed in PURPA—has determined all QFs are entitled to sell energy
either as available or pursuant to a LEO, including at a fixed rate.  It is not for PUCT—or this
Court—to second-guess FERC's determination, or to deny access to the full range of PURPA
entitlements to a particular class of QFs. *See id.* at 859 ("What the state may not do, however, is to
intrude into the Commission's exclusive jurisdiction to make QF status determinations by denying
to certified QFs the full avoided cost rates to which they are entitled.").

Next, the Court disagrees with Southwestern's apparent belief PUCT has implemented
§ 292.304(d) solely through Rule 25.242.  As noted above, state agencies can implement PURPA
through determinations in particular cases as well as by codified rules.  *FERC v. Mississippi*, 456
U.S. at 751.

Finally, the Court finds collateral estoppel and res judicata have no bearing on this case.  As
Southwestern itself argues, PUCT simply applied its own rules, and was not called upon to decide
whether it had failed to implement PURPA.

Therefore, Southwestern's and Occidental's Motions for Summary Judgment [##76, 109] are
DENIED.

## 5.    The Firm-Power Rule Redefines What Constitutes a Qualifying Facility

The Court alternatively finds PUCT's firm-power rule amounts to an improper, categorical
QF status determination—PUCT has rewritten PURPA's definition of what a QF is. *Independent*
*Energy*, while not binding on this Court, is instructive on this point:

> [The state rule in question] also violates PURPA by substituting for any "non-complying" QF an "alternative" avoided cost rate equal to 80% of the Utilities' avoided cost for short term economy energy.  QFs are entitled to receive the full avoided cost rates provided in the QF's standard offer contract, 18 C.F.R. § 292.304, and not a rate that is 80% (or less than 80%) of the full avoided cost rate.  The CPUCT program thus authorizes the Utilities to deny to QFs one of the benefits to which they are statutorily entitled under PURPA, resulting in the effective decertification of that QF. Because the authority to make QF status determinations resides exclusively with the Commission, we conclude that the CPUCT program is preempted by federal law.

*Indep. Energy Prods. Ass'n*, 36 F.3d at 854–55. Similarly here, QFs are entitled to either sell their energy on an as-available basis, or through a LEO.  As relevant here, a QF is a wind-energy facility with production under 80 megawatts.  *See* 16 U.S.C. § 796(17)(A).  Neither Congress nor FERC limited the definition of QF to wind-energy which is firm.  PUCT's policy fails to implement PURPA by closing off LEOs to some types of QF; in effect, PUCT is determining who is a QF for purposes of LEO formation, which it cannot do, because "the authority to make QF status determinations resides exclusively with the Commission."  *Id.* at 855; *see also Power Res. Grp.*, 422 F.3d at 236 n.2 ("Therefore, FERC alone must determine which facilities are QFs."); 18 C.F.R. § 292.207(d) (governing procedures for revocation of QF status before FERC).

## Conclusion

For all the foregoing reasons, the Court finds Exelon is entitled to judgment as a matter of law, and its Motion for Summary Judgment [#71] is GRANTED.  The Court finds PUCT's firm power rule is preempted by, and contrary to, PURPA and attendant federal regulations, specifically 18 C.F.R. § 292.304(d).  Accordingly, the Court hereby PERMANENTLY ENJOINS PUCT from further enforcement of its firm power requirement as a prerequisite to formation of LEOs, to the extent such enforcement is contrary to federal law and federal regulations, as described by this

order.[23] *See Indep. Energy Prods. Ass'n v. Cal. Pub. Utilities Comm'n*, N. C-91-2644 MHP, 1995 WL 329219, at *2 (N.D. Cal. 1995) (order on remand) (issuing permanent injunction against the California Public Utilities Commission).

Accordingly,

IT IS ORDERED that Occidental's Objections, Response, and Motion to Strike Plaintiff's Purported Undisputed Summary Judgment Facts [#96] is DENIED;

IT IS FURTHER ORDERED that Occidental's Motion to Compel Discovery [#75] is DENIED;

IT IS FURTHER ORDERED that Occidental and Southwestern's Joint Motion to Compel Depositions [#104] is DENIED;

IT IS FURTHER ORDERED that Intervenor Defendant Southwestern Public Service Company's Motion for Summary Judgment [#76] is DENIED;

IT IS FURTHER ORDERED that Defendants Public Utility Commission of Texas Commissioners' Motion for Summary Judgment [#80] DENIED;

IT IS FURTHER ORDERED that Intervenor Defendant Occidental Permian's Motion for Summary Judgment [#109] is DENIED;

IT IS FURTHER ORDERED that Plaintiffs Exelon Wind 1, LLC, et al.'s Motion for Summary Judgment [#71] is GRANTED;

---

[23]Exelon has also asked the Court to order PUCT to reopen consideration of Exelon's complaint before that body. The Court finds such relief is beyond the scope of this declaratory action, and declines to do so. *See Power Res. Grp., Inc. v. Klein*, No. A-03-CA-762-H, 2004 U.S. Dist. LEXIS 28820, at *23 (W.D. Tex. July 15, 2004). In addition, such relief would likely amount to a review of PUCT's application of PURPA to Exelon, which is beyond this Court's jurisdiction. *See id.* Finally, the Court is confident PUCT will comply with the Court's injunction in any further proceedings.

IT IS FINALLY ORDERED that Defendants Barry Smitherman, Donna L. Nelson, and Kenneth W. Anderson Jr., and the Public Utility Commission of Texas, are hereby PERMANENTLY ENJOINED from requiring that qualifying facilities provide firm power as a prerequisite to creation of a legally enforceable obligation under PURPA, as described in this order.

SIGNED this the 25th day of September 2012.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE